UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRSTMERIT BANK, N.A., as Assignee of the FDIC, receiver for Midwest Bank and Trust Company, ) ) ) ) Plaintiff, ) v. ) ) ANTIOCH BOWLING LANES, INC., ) et al., ) ) Defendants. ) | Case No. 12 C 9567<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

The character Walter Sobchak once said, "This is bowling. There are rules."[1] If only the same could be said regarding how the law classifies property items in a bowling alley. The issue in this case is whether various pieces of property at the Antioch Bowling Lanes qualify as fixtures or personalty under Illinois law. A finding that the items constitute fixtures would inure to the benefit of FirstMerit Bank, N.A., which seeks to foreclose on a mortgage; a finding that the items constitute personalty would allow a creditor, Kenneth Sterbenz, to lay claim to the items. What complicates the inquiry is that the governing state law principles derive from dated and, at times, inconsistent caselaw. In some instances, courts have relied on certain criteria in holding that an item was a fixture, while on other occasions, different criteria have proved decisive.

For the reasons set forth below, the court concludes that ABL's bowling lanes, including approaches, lane gutters, bowling ball return system, pin setting machines, and scoring consoles, are essential to the real property's long-time use as a bowling alley and are fixtures, subject to

---

[1] Walter Sobchak, played by John Goodman, is the mercurial sidekick to "The Dude" in *The Big Lebowski*.

FirstMerit's mortgage. The court further holds that the laneside tables and chairs are personalty and removable and saleable by Kenneth Sterbenz.

## I. FACTS

Plaintiff FirstMerit, N.A. ("FirstMerit") is in the process of foreclosing on a mortgage extended to a Land Trust, the sole beneficiary of which is Antioch Bowling Lanes, Inc. ("ABL") (Parties Joint Stipulation of Facts, hereinafter "Jt. Stip." ¶ 3). In 1992, ABL caused the property at 750 West Highway 173 in Antioch, IL (the "Property"), and all improvements thereon, to be conveyed to the Land Trust. (*Id*. ¶ 3.) The Property consists of a bowling alley (the primary business of the premises since the building was erected in approximately 1954) and attached rental real estate, occupied by various other businesses.

ABL has at all times been owned by the Sterbenz family. (*Id*. ¶ 2.) As far as the court has been made aware, the Sterbenz family consists of Joseph Sterbenz, who operated ABL during his working life but is now in his 80's residing in Florida, and Kenneth Sterbenz, Joseph's son, the registered agent and secretary of ABL, who has been operating the affairs of ABL for some time. The current mortgage loan was extended by Midwest Bank & Trust, FirstMerit's predecessor, in September 2002, secured by the real estate at 750 West Highway 173. (Parties' Joint Exhibit 2.) ABL, Joseph Sterbenz, the Land Trust, the Bains (who were operating the bowling alley in anticipation of buying it) and the Bains' entity, Antioch Lanes, Inc., executed a promissory note with Midwest Bank & Trust in 2002, secured by the 2002 mortgage. (Parties' Joint Exhibit 1.) When this loan matured in 2007, ABL sought and entered into a new loan agreement with Midwest Bank & Trust, again secured by the 2002 mortgage. (Parties' Joint Exhibit 3.) ABL defaulted on the 2007 loan agreement, giving rise to this foreclosure action.

ABL purchased all of the bowling mechanisms currently located at the Property, including the bowling lanes, lane gutters, bowling ball return system, pin setting machines, scoring consoles, and bowling seats and tables installed in the Property. (Jt. Stip. ¶ 4.) On June 18, 2010, a microburst storm damaged the Property. (*Id.*¶ 5.) As a result of the damage caused by the microburst, the bowling lanes, ball return system and the lane gutters had to be replaced. (*Id.* ¶¶ 5, 6.) Kenneth Sterbenz, who was then the primary decisionmaker for the Property, loaned ABL $920,000 for business operations and to purchase replacement equipment for the equipment damaged by the microburst. (Tx. of April 9, 2015 at 94.) Kenneth Sterbenz has a secured interest in the "collateral," described at page 8 of the Parties' Joint Exhibit 11.) The collateral includes personal property, investment property, contract rights, inventory, goods, chattel paper, accounts, equipment, and general intangibles (for a fuller description, see Joint Exhibit 11 at 8.)

II. **DISCUSSION**

This case, which the parties have to a limited extent resolved, involves a simple-sounding question: Whether the bowling lanes, lane gutters, bowling ball return system, pin setting machines, scoring consoles, bowling seats and tables are fixtures, which would make them subject to FirstMerit's mortgage and current foreclosure action, or personalty, such that Kenneth Sterbenz can remove and sell them. The case is not simple, however, since relevant Illinois authority tends to be very old; not consistently theorized; and usually holds "intent" to be determinative, even though parties in these cases rarely seem to think about this issue, let alone harbor intent. Another difficulty is that a commonly-relied-upon factor in characterizing property as fixture or personalty is whether the property can easily be moved from the premises without damaging the real estate. *See, e.g.*, *Sword v. Low*, 122 Ill. 487, 497 (1887). Over time,

as the cases have aged, bowling alley equipment such as that involved here has become more portable and less long-lived, as laminates, rather than wood or metal, have been used for the construction of much of the equipment.

Although the court was initially swayed by Sterbenz's evidence of the portability of modern, laminate bowling equipment, the court's more thorough study of Illinois law has convinced it that this case must be resolved in FirstMerit's favor. If one looks only to cases arising in the mortgage and real estate assessment contexts (standards in the landlord/tenant context are different),[2] an old doctrine called the "integrated industrial doctrine" emerges.

This doctrine looks less to the permanency of annexation (*i.e.,* whether the property in question can be moved) and more to the issue of whether the property in question is appropriated or adapted to the use or purpose of the part of the realty to which it is annexed. *See Commonwealth Edison,* 219 Ill. App.3d at 556-57. Although property may not be attached to the real estate and may be easily movable, the cases recognize a concept of constructive annexation, applied when the property is so necessary to the use of the mortgaged realty that the intent of the property's owner (and the court views the Sterbenz family as the owner, even though the Land Trust actually holds the real estate) to make a permanent annexation can be inferred. *See Owings v. Estes*, 256 Ill. 553, 556 (1912). In short, since the Sterbenz family is for all practical purposes the owner of the bowling alley, and since the bowling alley can function as such only if it has lanes, pinsetters, ball returns and gutters, the integrated industrial doctrine compels the court to infer an intent to annex this property permanently to the real estate. Nor do the cases seem to

---

[2] Illinois law also recognizes a species of property referred to as "trade fixtures," which are treated as personalty under the law. *See Commonwealth Edison Co. v. Property Tax Appeal Bd.,* 219 Ill. App.3d 550, 556-57 (2d Dist. 1991). Insofar as the court has been able to determine, trade fixtures are fixtures installed by a *tenant* for the purpose of carrying out the tenant's trade or business. *Id.* Because there is no evidence that ABL or Sterbenz was a *tenant* of the mortgaged premises, the concept of "trade fixtures" is not relevant to this action. *Id.*

care that this annexation be permanent in the sense that the property is annexed only for its useful life and when necessary replaced. If the property is essential to the use to which the real estate is put, it is covered by the real estate mortgage.

Illinois' recognition of the "integrated industrial doctrine" was confirmed recently in a February 2015 Update of the "Illinois Real Property Service." *See* John P. Fitzgerald, 11 Illinois Real Property § 58:7 (citing *Commonwealth Edison Co. v. Property Tax Appeal Bd.,* 219 Ill. App.3d 550 (2d Dist. 1991)). The Update described the doctrine as considering "all machinery of a plant or factory necessary for its operation as a complete, ongoing concern to be part of the real estate." *Id.*

The application of the doctrine, although not called by its current name, can be seen in an early Illinois Supreme Court case, *Fifield v. Farmers' Nat'l Bank of Princeton,* 148 Ill. 163 (1893). In this litigation between a shoe manufacturer, whose shoe factory had become bankrupt, and the bank which held a trust deed, the question was whether the shoe-making equipment should be characterized as fixtures, in which case it belonged to the bank, or personal property of the shoe manufacturer. *Id*. at 168. The court stated the relevant test as follows:

> First, real or constructive annexation of the thing in question to the realty; second, appropriation or adaptation to the use or purpose of that part of the realty with which it is connected; third, the intention of the party making the annexation to make it a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation and the policy of the law in relation thereto, the structure and mode of the annexation, and the purpose or use for which the annexation has been made.

148 Ill. at 169-170 (citation omitted). The court quoted approvingly from a Massachusetts case, *Pierce v. George*, 108 Mass. 78 (1871), which stated the following: "'Articles placed in a mill by the owner to carry out the obvious purpose for which it was erected, and adapted to that purpose,

are generally part of the realty, notwithstanding the fact that they could be removed and used elsewhere.'" 148 Ill. at 172 (citation omitted).

The Illinois Supreme Court reached a similar conclusion in *Owings v. Estes*, 256 Ill. 553 (1912). Noting that "what is annexed to the land becomes a part of the land," the court aptly observed that "it is not always easy to determine what constitutes an annexation sufficient for such purpose." *Id*. at 555. The *Owings* court held that showcases, showracks and other articles attached to the interior of a building used for the manufacture and sale of harnesses were part of the realty. *Id*. at 557. The court reasoned that the articles were attached to the real estate "more or less securely," were "purchased or made for the particular use to which they were appropriated in the building, and were specially adapted to that use." *Id*. Furthermore, the court explained, the party making the annexation owned the building and used the articles in connection with the building for approximately ten years. *Id.* That party's intent to attach the articles so that they would become a permanent part of the building was thus "clear" to the court. *Id*.

The Seventh Circuit applied similar reasoning in *Theodore A. Kochs Co and Efaich Co. v. Wick,* 120 F.2d 603 (7th Cir. 1941), a case involving plant machinery and equipment claimed by the holder of a real estate mortgage against the bankruptcy trustee, who had sold it. The court noted that although the property was "substantially attached or fastened to the premises and formed an indispensable part of the factory, nevertheless it was removable without material damage to itself or to the freehold." *Id.* at 604. The Seventh Circuit "presumed" that "when machinery is installed which is indispensable to the operation of the factory, that the owner intended to affix the machinery permanently to the premises." *Id.* Citing *Fifield*, as well as other Illinois cases, the court noted that while "it [was] true that the machinery in question was not an

6

integral part of the permanent buildings and was removable without injury to the freehold," the owner-annexor's intent to make a permanent improvement to the freehold is paramount. *Id.* at 606. The court further reasoned that intent is to be *inferred* from the nature of the machinery, the relation of the parties, the structure and mode of the annexation and the purpose of the annexation. *Id*.

If one steps back from these cases, a few takeaways become clear. First, most of the articles in question (although not all of them) were removable without damage to the realty. A secondary market for all of them clearly existed, as evidenced by the specific disputes involved. And in no case did the court make its decision based on testimony of actual intent. Rather, if an owner of the premises installed equipment necessary to use the realty in the manner in which he used it, and the equipment was in fact necessary to the realty's use, the owner was viewed as having intended a permanent installation and the equipment was viewed as a fixture.

By the time of *Joyner v. Mitchell*, 267 Ill. App. 427 (4th Dist. 1932), the issue of the manner of annexation was completely subordinated to the issue of whether the property in question was necessary to the use to which the real estate was employed. In *Joyner,* the court quickly passed over the issue of how the machinery in question was annexed (attached by belts, pulleys and shafts to beams in the roof). *Id*. at 429. Rather, it stated:

> The building used as a machine shop had been used for several years for that purpose prior to the execution of the mortgage . . . . If machinery is intended for permanent use in carrying on the business for which the building was erected or is used, and as a permanent accession to the realty, it becomes a part of the realty on being installed thereon, and if such was the intention, it is immaterial that the machines may be removed and used elsewhere, and that they may be removed without injury to the building.

*Id*.

7

*Guardian Life Ins. Co. of America v. Swanson,* 286 Ill. App. 278 (1st Dist. 1936), involved the question of whether twenty electric refrigerators installed in real estate used as a rental building were fixtures or personalty. The refrigerators, it was conceded, were readily removable. *Id*. at 282. While the key question was intent, the court noted that the key to determining intent is the property's adaptation to the use to which the realty is devoted. *Id*. at 282-83. Quoting from a Wisconsin case, *Thomsen v. Cullen,* 196 Wis. 581 (1928), the court stated:

> Very slight incidents, such as connection by an electric wire, by a leather belt, or other slight physical annexation which might be severed without injury either to the personalty or the realty, are seized upon by many courts as a basis for holding the fixture as part of the realty. It is considered that a rule based upon such slight circumstances is not well grounded. It is considered that what makes a fixture attached by a belt or wire or pipe a part of the realty is the use to which it is put rather than the mere physical attachment. If it is a necessary integral part of the plant, as between mortgagor and mortgagee it is considered realty.

*Swanson*, 286 Ill. App. at 287-88.

Reasoning that "necessity impelled [the property owner] to purchase and install the refrigerators to secure" the tenants he wanted, the court held that the refrigerators were fixtures:

> [The owner's] intention is clearly and conclusively shown by the evidence to have been to annex the same as fixtures. It is a matter of common knowledge that electric refrigeration is economically essential in a comparatively modern building . . . and that apartments without such equipment are not readily rentable to tenants of the class for which such a building is designed. It is obvious that [the owner's] purpose in installing the refrigerators was to permanently increase the value of the building for occupancy by tenants . . . .

*Id.* at 284.

*Ayrshire Coal Co. v. Property Tax Appeal Bd.,* 19 Ill. App. 3d 41 (3d Dist. 1974), addressed the proper classification of certain heavy machinery and equipment in a preparation plant located at one of Ayrshire's mines. In this case, the size and manner of annexation of the property in question would probably have led the court to find it a fixture regardless of the test

applied. *Id*. at 45-46. Nevertheless, the court applied the "integrated industrial plant" doctrine, finding it most consistent with modern trends. *Id*. at 46. The contested equipment in *Ayrshire* was attached by nuts and bolts, or welded, to supporting piers or foundations which were firmly attached to the real estate to prevent vibration. *Id*. at 42. The mine was expected to run out of coal in 4-5 years, at which time the plant would be moved to a new location, although moving the plant would require it to be dismantled as it was not designed to be moved. *Id*. at 43. However, the plant could be moved without damage to the real estate, and some of the machines and equipment had been moved in and out. *Id*. at 43-44. Citing the "integrated industrial plant" doctrine, which the court described as "represent[ing] the modern trend of decisions," the court held that any machinery essential to the proper functioning of a plant is at least presumed to be a fixture. *Id.* at 46. The court added, "Where property is adapted to the use to which the realty is devoted the use thereof in such manner furnishes such strong evidence of intent to make it a part of the freehold as not to be overcome by bookkeeping practices." *Id.*

*Beeler v. Boylan*, 106 Ill. App. 3d 667 (4th Dist. 1982), reaches a contrary result, but the court engaged in a useful analysis of the "integrated industrial doctrine" and went to great pains, in keeping with that doctrine, to find that the equipment in question was not necessary but optional to the owner's use of the real estate. *Id*. at 669-70. The court described what it characterized as two tests used to determine whether property is a fixture or personalty. The first is the intention test. It relies on findings that (i) the "property [was] annexed to the realty or to something appurtenant thereto," (ii) the property's application to "the use or purpose" to which the part of the realty to which it is connected is appropriated, and (iii) the intention of the party making the annexation "to make a permanent accession to the freehold." *Id.* The second test is the "integrated industrial doctrine," which establishes that "all machinery of a factory or plant

9

necessary for its operation as a complete going concern, is considered to be part of the freehold."
*Id.* at 671. The tests are closely related, the court observed, with the integrated industrial doctrine merely subordinating the degree of physical annexation to the interrelationship between the disputed piece of property and the underlying real estate. *Id.* at 672. If the disputed property is essential to the use to which the real estate is put, the property is viewed as part of the real estate. *Id.* Based on this analysis, the court held that two grain dryers used as part of a farming operation were personalty, not fixtures, since the dryers were not essential to petitioner's farming operation but were "merely one of several means to handle harvested grain" and "in nowise necessary to the farming operation."[3] *Id.* at 672.

The Illinois case involving facts closest to those in the case at bar is *Cherry Bowl, Inc. v. Property Tax Appeal Bd.,* 100 Ill. App. 3d 326 (2d Dist. 1981), involving the question of whether automatic pinsetters and lanes in a bowling alley were fixtures or personalty. The court noted that on the subject of bowling lanes and pinsetters, the cases in other jurisdictions sometimes reached different results. *Id.* at 330. Nevertheless, the court ruled that where pinsetters and lanes were installed by the plaintiff in a building which was constructed primarily to be used as a bowling alley, and where the evidence indicated that the plaintiff planned to use the equipment for as long as it owned and operated the bowling establishment, the property should be considered as fixtures and not personalty. *Id.* at 331.

On its initial reading, this court was of the view that *Cherry Bowl* could be read to support Sterbenz here. The lanes and pinsetters, installed well before 1981, were wooden structures, braced through various attachments to the bowling alley's concrete floor. *Id.* at 327-

---

[3] *See also A & A Market, Inc. v. Pekin Ins. Co.,* 306 Ill. App. 3d 485, 488 (1st Dist. 1999) (holding that gas pumps in a gasoline station were fixtures and not personalty, because, among other reasons, "pumps are essential to the completeness of the gas station, for the purposes for which it has been build and is being operated").

10

28. While the lanes could be removed by backing out the screws which held them, doing so would require cutting the lanes into sections, requiring six men to work six hours to remove one lane. *Id*. at 328. Even more important, the equipment had a useful life of 20-50 years, as opposed to the significantly shorter anticipated useful life of the more-easily removable laminate equipment at issue in this case. *Id*. at 331.

However, having read all the cases on which *Cherry Bowl* relies, this court is persuaded that removability and anticipated life expectancy are not, or should not be, the operative considerations. The question on which the better-reasoned cases rely is whether the disputed equipment is essential to the use to which the real estate is applied.

The court is aware that at the hearing held on April 9, 2015, FirstMerit's representative, Mark Freeman, testified that FirstMerit's intention was to collaterize its mortgage with a working bowling alley, not just the empty shell of a building. At the same hearing, Kenneth Sterbenz testified that it was always his intention to remove and sell the bowling equipment at issue if circumstances warranted. The court finds, however, based on contemporaneous documents (*see, e.g.,* Joint Exhibit 3), that there is no adequate evidence of *ABL's* intent when it entered into the 2007 Promissory Note. While the court credits Mr. Sterbenz's testimony that he *anticipated* that he could always sell the controverted equipment if he decided to do so, it does not find that his expectation, uninformed by Illinois law, is dispositive. Instead, having studied the cases, what the court finds dispositive is the close relationship between the equipment and the real estate's use over many years.

Thus, even though the controverted laminate structures are bolted into the real estate (here, they are actually bolted into less easily removable wooden bowling understructures), and even though the bolts can be removed without permanent damage to the real estate or the

bowling equipment, and even though (as is true in many of the cited cases) the bowling equipment can be easily sold on the secondary market, the court is persuaded that the bowling equipment in question was essential to the use to which the real estate had long been applied. For that reason, the equipment in question under Illinois law should be characterized as fixtures, not as personalty, and subject to FirstMerit's mortgage.

## CONCLUSION

Based upon the cases described above, the court concludes that ABL's bowling lanes, including approaches, lane gutters, bowling ball return system, pin setting machines, and scoring consoles are essential to the real property's long-time use as a bowling alley and are fixtures, subject to FirstMerit's mortgage. Based upon the testimony at the hearing in this case that FirstMerit never believed that it had a lien on the tables and chairs used by bowlers at laneside (tx. 56-57), as well as the lack of any evidence suggesting that such tables and chairs are essential to the functioning of a bowling alley, the court holds that the laneside tables and chairs are personalty and removable and saleable by Kenneth Sterbenz.

DATED: June 5, 2015  /s/
JOAN B. GOTTSCHALL
United States District Judge